**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1754

MARY ROE 1818,

Plaintiff - Appellant,

v.

THE BISHOP OF CHARLESTON, a corporation sole; THE BISHOP OF THE DIOCESE OF CHARLESTON, in his official capacity,

Defendants - Appellees.

Appeal from the United States District Court for the District of South Carolina, at Charleston.  Richard Mark Gergel, District Judge.  (2:21-cv-00020-RMG)

Submitted:  March 21, 2023                          Decided:  May 17, 2023

Before NIEMEYER, DIAZ, and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ON BRIEF:** Lawrence E. Richter, Jr., THE RICHTER FIRM, LLC, Mt. Pleasant, South Carolina; James B. Richardson, Jr., Columbia, South Carolina, for Appellant.  Richard S. Dukes, Jr., Charleston, South Carolina, Carmelo B. Sammataro, TURNER PADGET GRAHAM & LANEY, P.A., Columbia, South Carolina, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This case involves allegations of yet another reprehensible example of sexual abuse by a Catholic priest, which allegedly took place between 1961 and 1966 to a young girl born in 1959. Mary Roe 1818 (a pseudonym) alleged that a priest at St. John Catholic Church in the Diocese of Charleston, South Carolina often came to her house and babysat for her and her younger sister when Mary was 3 or 4 years old. She alleged that as the priest lay "on the couch," he "invit[ed] [her] and her sister to sit on his lap for a 'pony ride.'" In that process, as she alleged, the priest "placed [her] on his crotch, holding on to [her] waist while moving her up and down on his erect penis." While she never reported the conduct, she nonetheless alleged that she suffered enormously from it with "guilt, shame, loss of the enjoyment of her family and life generally, lack of self-worth, and depression, with physical manifestations."

Mary commenced this action in January 2021 against the Diocese of Charleston ("The Bishop of Charleston, a corporation Sole, and the Bishop of the Diocese of Charleston, in his official capacity"), alleging a range of torts relating to the Diocese's concealment and coverup, negligent monitoring and disciplining of priests, and breach of a fiduciary relationship alleged to exist between the Diocese and its parishioners.

The Diocese answered Mary's complaint and, following discovery, filed a motion for summary judgment based on several grounds, including that the Diocese at the time enjoyed charitable immunity under South Carolina law from all torts and that Mary's claims were barred by the applicable statutes of limitations, as her claims lapsed under controlling principles "no later than August 5, 1980." The district court granted the

2

Diocese's motion based on the doctrine of charitable immunity, finding it unnecessary, in light of that ruling, to address the Diocese's other arguments for summary judgment.

Mary filed this appeal, and, for the reasons given here, we affirm.

In 1914, the Supreme Court of South Carolina recognized that "[a] charitable corporation is not liable to injuries, resulting from *the negligent or tortious acts* of a servant, in the course of his employment, where such corporation has exercised due care in his selection." *Lindler v. Columbia Hosp. of Richland Cnty.*, 81 S.E. 512, 512 (S.C. 1914) (emphasis added). The doctrine was expanded two years later when the court held that charitable immunity extended to liability "for the torts of their superior officers and agents as well as for those of their servants or employees, whether these be selected with or without due care." *Vermillion v. Woman's Coll. of Due West*, 88 S.E. 649, 650 (S.C. 1916). The *Vermillion* court explained that a charitable corporation's exemption from tort liability rested "not upon the relation of the injured person to the charity, but upon grounds of public policy, which forbids the crippling or destruction of charities . . . to compensate one or more individual members of the public." *Id*. It reasoned that it was "better for the individual to suffer injury without compensation than for the public to be deprived of the benefit of the charity." *Id*. The doctrine was recognized and continued in cases thereafter, including a case decided in favor of the Diocese in 1966. *See Decker v. Bishop of Charleston*, 147 S.E.2d 264, 268 (S.C. 1966).

In the years that followed, however, in response to public criticism of the doctrine, the South Carolina Supreme Court began to narrow it. In 1973, the court held that because the early broad formulation of the scope of the immunity in *Lindler*, *Vermillion*, and *Decker*

3

was unnecessary to the decision in those cases, the court could narrow the immunity to exclude intentional torts, and it did so pursuant to reason and in the interest of justice. *See Jeffcoat v. Caine*, 198 S.E.2d 258, 260 (S.C. 1973). Finally, in 1981, the court abolished charitable immunity altogether. *See Fitzer v. Greater Greenville South Carolina Young Men's Christian Ass'n*, 282 S.E.2d 230, 232 (S.C. 1981) (holding that the "doctrine of charitable immunity is abolished in its entirety"). A few years later, the court held that its *Fitzer* holding applied "prospectively only." *Hupman v. Erskine Coll.*, 314 S.E.2d 314, 315 (S.C. 1984). Thus, during the period of 1961 to 1966, when the events of this case allegedly took place, the immunity applied as articulated in *Lindler* and *Vermillion*.

In this case, the district court concluded first that there was no question as to the fact that the Diocese was a charitable institution covered by South Carolina's doctrine of charitable immunity. Second, it concluded that the doctrine, as articulated in *Lindler* and *Vermillion*, applied fully during the period of the events alleged by Mary. And finally, it found particularly instructive that the immunity had been held to apply in particular to a case similar to this one. In *Doe v. Diocese of Charleston*, the plaintiff alleged that, beginning in 1959 or 1960, he had been abused while a minor student at an elementary school owned by the Diocese, asserting claims like those in this case, including outrage, breach of fiduciary duty, negligent supervision, and fraudulent concealment. The *Doe* court held that all the plaintiff's claims were barred by charitable immunity, explaining:

> It is undisputed that the events in question occurred before the abolition of the Doctrine of Charitable Immunity in 1981, and even before the Supreme Court's *prospective* limitations on its application, such as the intentional torts exception in 1973. Accordingly, at the time of the events in question, it was the law of South Carolina that charities were immune *as to all tort liability*.

4

*Doe*, No. 02-CP-10-0770, 2003 WL 25456994 (S.C. Ct. Com. Pl. Jan. 10, 2003) (emphasis added). The court also held, as did the district court in this case, that "even if the Court were to apply the intentional torts exception retroactively, the Diocese would still be immune. Certainly, [the priest's] heinous acts were intentional and criminal, but there are no allegations in the Complaint, nor are there any facts offered by the Plaintiff, suggesting that the Plaintiff's injuries were caused by intentional acts of the Diocese itself." *Id.*

Mary argues that the 1973 decision in *Jeffcoat* did not simply narrow the doctrine of charitable immunity to exclude intentional torts but was describing the scope of the doctrine as it existed under *Lindler* and *Vermillion*. Yet this argument does not seem to be supported by the text of *Jeffcoat*. To the contrary, *Jeffcoat* recognized that the scope of the immunity stated in the earlier cases was *broader* than that which was necessary in light of the underlying facts before the court in each case; it stated, "the broad statement of a rule of complete exemption from tort liability was unnecessary to a decision in those cases." 198 S.E 2d at 260. The *Jeffcoat* court appears to have made that observation to permit its narrowing of the immunity doctrine to exclude intentional torts. It did not, however, hold that the doctrine always excluded intentional torts.

Moreover, as in *Doe*, we have not found any facts in the record here to support a claim that the Diocese's conduct was intended to injure Mary. Of course, she does present facts that the priest's conduct was intentional, but he is not a party to this action as he has long been deceased.

While we completely sympathize with Mary's pain and suffering, we nonetheless must conclude that the district court's decision was well supported by South Carolina law. Accordingly, substantially for the reasons given by the court, we affirm.

AFFIRMED